SHIRLEY BAERTSCH, Plaintiff and Appellant, v. FORREST A. BAERTSCH, Defendant and Respondent.

No. 11799.
Decided April 2, 1970.
467 P.2d 142.

Mahan & Strope, Helena, Philip W. Strope (argued), Helena, for appellant.

Leo J. Kottas (argued), Helena, for respondent.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This is an appeal from an order modifying a decree of divorce from Lewis and Clark county.

It appears from the record that plaintiff wife departed from the family home in February of 1969 and on February 27, 1969, instituted an action for divorce and sought custody of their three children. Defendant husband answered also seeking divorce and custody of their three children. Following a trial before the court a decree dated June 5, 1969, filed June 6, 1969, was entered in the district court.

In the decree the court found both parties entitled to a decree of divorce, and both fit and proper persons to have the care, custody and control of the minor children. The court granted custody of the two boys, Steven Curtiss, aged 9, and Stacey Lee, aged 7, to the defendant father, and the custody of the daughter, Susan Jeanine, aged 4, to the plaintiff mother, all subject to certain visitation rights, and the father to pay $75 per month for support during the time the daughter resided with her mother.

Ou Aug. 7, 1969, the father filed an affidavit charging plaintiff with cruel treatment upon Steven; with plaintiff threatening that if she obtained custody of the boys she would remove them from the state; that she had told the children she was going to marry and they would have a new father; that the boys had informed defendant they did not want to live with plaintiff; that the little girl had asked defendant to keep her; and he has sought to have the custody of the daughter given to him. Plaintiff then executed an affidavit wherein she charged defendant with failure to live up to the divorce decree; that he had beaten her; that the child Steven was in need of psychiatric assistance and counseling; and that since she had remarried and had a fine home life she should be granted the care, custody and control of all the children.

The court on September 11, 1969, following a hearing, entered an order modifying the decree of divorce, finding that there was a change of conditions since the entry of the decree in that plaintiff was not a fit and proper person to have custody of the children and that it was in the best interests of the children, as

well as their desire, that they be in the custody of their father and that they be together and not separated.

The court then decreed that plaintiff was not a fit and proper person to have the custody of the minor children, that their custody was awarded to the defendant with reasonable visitation rights to the plaintiff in Lewis and Clark county; that the daughter be returned by the plaintiff to the defendant; that the provisions for plaintiff to have all the children for one month during the summer of each year, to have custody of the daughter and that defendant pay $75 per month as child support be expunged and eliminated from the decree.

Plaintiff thereafter moved to amend or alter the order to grant a new trial which was denied. This appeal followed.

While plaintiff poses two issues they both resolve around the proposition of whether or not there was credible evidence to uphold the district court's finding of a material change in circumstances since the entry of the decree of divorce.

Little would be served by a complete recitation of the testimony presented at the hearing before the court on the petition. However, certain facts do stand out and we shall briefly comment thereon.

Plaintiff left the family home in February of 1969, and the record indicates that she was interested in another man. Upon the trial of the divorce case she testified that she was not interested in anyone else, but at the time of an altercation brought about by discovery of the other man on the premises where plaintiff was staying on June 18, defendant was very loud in his conduct and police officers were called and requested him to leave the premises. At that time Herrin, the other man, and present husband of plaintiff, was still married to his wife. He obtained a divorce on August 18, 1969, and married plaintiff on August 23, 1969 in Wheatland, Wyoming.

Herrin and his former wife had six children, five girls and one boy, the boy being blind. His wife was awarded custody of all six children.

Testimony of the defendant is to the effect that the children have many times expressed themselves as desiring to stay with him and not with their mother.

Plaintiff mother testified:

"A. Stephen [sic] right now, he is, I think, a very deeply troubled little boy, because he has, well, been pulled in two directions for over two years, now, and he's, I feel, been taught to be bitter toward me, because his father is bitter toward me; and I just feel that he is very—especially in the last year, his attitude toward me—there is no 9-year old child, that could ever treat their mother the way Stephen [sic] has treated me, with the hardness and the bitterness and the absolute cruelty, really, and he's been cruel to me physically and mentally, and I feel that he is suffering very deeply from his problems that came up from time to time, *I'm sorry to say, to have to admit, that I have had a part in creating the problems that there is in my son now; and I just hope to God, as he grows up and he gets older, he will come out of it.*" (Emphasis added.)

While plaintiff charged in her affidavit that Steven needed psychiatric assistance there is no medical testimony to that effect.

As to her youngest son she stated:

"Q. Now, your second child, your son Stacey, how old is he? A. Stacey is 7.

"Q. And what kind of a child is he? A. He is a very quiet, sensitive child, which is exactly how Stacey has been ever since he was born. He is a very loving little boy, and this has been quite a traumatic experience for him."

As to both she testified:

"Q. Shirley, just before lunch, we were talking about your sons, Stephen [sic] and Stacey. And I was asking you what was your relationship—What's your relationship, now, between you and Stacey, or Steve? How do you characterize that in your own words? A. My relationship with my sons; they're very—I mean, they are very drawn from me."

Since her remarriage plaintiff has moved to a ranch approximately 20 miles in the country from a small town in Wyoming, the nearest school being five miles away. Defendant's home remains as it had been all during the lifetime of the children, in the Helena valley.

Perhaps the most compelling evidence before the court was described in these words by defendant in his testimony:

"Q. Now, sometime back in the summer, after the Decree of Divorce, did Mrs. Shirley Baertsch, now Herrin, come to your place to visit the children? A. Yes sir.

"Q. When was that? A. July 25th, I believe it was.

"Q. And did she come to your home? A. Yes.

"Q. Did anything happen while she was there at the home? A. Yes, it did.

"Q. What was it? A. Well, her and our oldest son had a little disagreement, and it kept getting worse, and worse, and worse, until she asked me to spank him; and I said, 'Spank him yourself, it's your own son'. So she proceeded to do it, and she couldn't do it. But she finally lost her temper and took off a high-heeled shoe, and began beating him with the spike end of the high-heeled shoe.

"Q. Did you try to stop her? A. I did finally stop her.

"Q. In trying to stop her, did she then try to attack you? A. That's right, she did.

"Q. What did she do? A. What—

"Q. What did she do to you? A. She started kicking and scratching and raising a little devil, and I told her to settle down and behave to the little kids or leave. And she kept it up, and I says, 'You do it again and you're going to get it.' She kept hitting and fighting, so I slapped back—slapped her face with the back of my hand, once.

"Q. Did you have other people come there and see the little boys—the marks on the little boy and on you? A. Yes sir. I took him up to his grandmother's house, and Maxine Olson

called her, and she came up; and Karen Hamilton and the kid's grandmother.

"Q. And they all saw the little boy? A. They all saw him 15 minutes after it happened.

"Q. And did you have any pictures taken? A. Yes, I did."

The picture of the boy clearly shows bruises on his skin. A neighbor lady testified that she came to the Baertsch home after the altercation with the boy's mother and she stated: "On his back I think there was four round marks that looked like he had been struck with something."

Plaintiff in her testimony stated that the boy needed disciplining, that he was kicking at and being very cruel to his little sister and that she tried to stop him and started to spank him and the boy started kicking her with his cowboy boots; that at that time defendant threw her down on the floor, sat on her and injured her. Her counsel handed her the photograph of her son and asked her if she thought she put those little heel marks on him. To which she replied:

"A. No, I did not, because I didn't have the opportunity to hit the child, I was thrown from him before I did.

"Q. How do you think those marks got on him? A. Well, I don't know; *I didn't intend to hit the child.*" (Emphasis added.)

Following an objection and ruling by the court, the plaintiff added: "The child didn't cry."

On cross-examination she testified:

"Q. Did you have trouble with him? A. Yes, I tried to discipline Stephen [sic], yes.

"Q. And you tried to discipline him? A. Yes.

"Q. And you had trouble doing it? A. Yes.

"Q. Did you strike him? A. In what manner do you mean?

"Q. Did you strike him? A. I tried to strike him."

From these statements it would appear that the version of the defendant is more credible and furnished a basis for the findings of the district court.

The district judge saw the witnesses in this cause, he observed the parties on the witness stand, their demeanor while testifying, their attitude toward each other and their children, and it appeared to the court that a substantial change of circumstances had occurred.

We recently reviewed the law applicable to matters of this kind in Simon v. Simon, 154 Mont. 193, 461 P.2d 851, 26 St.Rep. 706, and we see no need to repeat it here.

At the conclusion of the hearing the court expressed the view that it was confronted with a difficult situation; that while children normally stay with their mother, in this cause they did not want to go to their mother; that it was the court's belief that brothers and sisters should be raised together when no part of the marriage relationship could be salvaged.

While there were conflicts in the evidence it stands without question that the home of defendant is a good and proper one, that his care of the boys is good, they are clean and well-kept, and the school is nearby, and grandparents live in the vicinity; that it is the only home the boys have ever known and the same was true of the girl until she was removed therefrom by the plaintiff when she left.

The court felt the best interests of the children would be served if the boys were left in the care, custody and control of the father, and the care, custody and control of the daughter given to the father. We see no reason to disturb the court's judgment. Upon the record before this Court we cannot say that the district court abused its discretion in its disposition of this matter.

The order of the district court is affirmed.

MR. JUSTICES CASTLES, HASWELL, and JOHN C. HARRISON, concur.